Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL III

| | | |
|---|---|---|
| WILLIAM CONTRACTOR, INC., WILLIAM BONILLA Y LYMARY BENIQUE<br><br>Apelante<br><br>v.<br><br>BANCO POPULAR DE PUERTO RICO, MULTIPLAZA DE PUERTO RICO, INC., Y ASEGURADORA ABC<br><br>Apelados | TA2025AP00206 | APELACIÓN procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Civil núm.: SJ2018CV01711 (503)<br><br>Sobre: Violación de Responsabilidad Fiduciaria; Cobro de Dinero; Daños; Declaración Unilateral de Responsabilidad |

Panel integrado por su presidente el juez Hernández Sánchez, el juez Rivera Torres y el juez Marrero Guerrero.

**Rivera Torres, Juez Ponente**

**SENTENCIA**

En San Juan, Puerto Rico, a 29 de septiembre de 2025.

Comparece ante este tribunal apelativo, William Contractor Inc. (WC o la parte apelante) mediante el recurso de apelación de epígrafe solicitándonos que revoquemos la *Sentencia* dictada por el Tribunal de Primera Instancia, Sala Superior de San Juan (el TPI), el 13 de mayo de 2025, notificada el mismo día. Mediante dicho dictamen, el foro primario declaró *HA LUGAR* a la *Solicitud para que se Dicte Sentencia Sumariamente* que presentó el Banco Popular de Puerto Rico y *No Ha Lugar a la Réplica a Moción Solicitando que se Dicte Sentencia Sumaria y Moción Solicitando que se Dicte Sentencia Sumaria Parcial a favor de la Parte Demandante* que presentó WC. En consecuencia, desestimó en su totalidad y con perjuicio la demanda instada por la parte apelante.

Asimismo, acogió el desistimiento realizado en corte abierta relativo a Multiplazas de Puerto Rico, Inc., y lo declaró *HA LUGAR.*

Por lo que, al amparo de la Regla 39.1 de las de Procedimiento Civil, decretó el archivo con perjuicio de la reclamación presentada en contra de esta parte.

Por los fundamentos que expondremos a continuación, confirmamos el dictamen apelado.

**I.**

El 28 de marzo de 2018, William Contractor, Inc., el Sr. William Bonilla, la Sra. Limary Benique y la Sociedad Legal de Gananciales por ellos compuesta, presentaron una demanda sobre incumplimiento de contrato, violación de responsabilidad fiduciaria, cobro de dinero, daños, y declaración unilateral de responsabilidad en contra de Multiplazas de Puerto Rico, Inc., (Multiplazas) y el Banco Popular de Puerto Rico (BPPR o parte apelada), entre otros demandados. En esencia, arguyeron que el 13 de abril de 2007, WC fue contratado por Multiplazas para completar la construcción del Centro Comercial Plaza del Mar en Hatillo por un monto aproximado de $8,000,000. Indicaron que el costo máximo del proyecto, como contratado y diseñado incluyendo posibles cambios en órdenes, podía tener un costo máximo de $10,000,000.

Señalaron que el BPPR financió el proyecto en su totalidad y certificó que tenía una línea de crédito disponible para el mismo de $26,000,000. Expusieron que WC proveyó una fianza "*Payment and Performance Bond*" expedida por *United Surety & Indemnity Company* (USIC), y endosada a el BPPR por el costo de la construcción del proyecto. Asimismo, alegaron que, antes de firmar el contrato, WC solicitó al BPPR certificar el préstamo de construcción para que pudiese expedir la fianza, y BPPR presentó una carta el 7 de mayo de 2007, estableciendo que Multiplazas tenía una línea de crédito ascendente a $26,750,000 para la construcción de la obra. Así, USIC expidió la fianza, amparado en dicha

información y certificación de que esa línea era exclusiva para el proyecto, según fuera representado por el BPPR.

Establecieron que el proyecto se realizó por etapas, pero que no recibió el pago de las certificaciones número 9 a las 13 debido a la falta de fondos. No obstante, continuó trabajando en la obra pues presumió que se le pagaría, al entender estaban disponibles más de $20,000,000. A pesar de ello, WC paralizó la construcción, por falta de fondos, ya que existía una deuda a su favor por $4,800,000 sin que se pagara la misma. La cual era una cuantía significativamente menor a la que se supone debía estar disponible en la línea de crédito para el proyecto, por lo que no había razón para dejar de pagarle.

Alegaron que la certificación de fondos, emitida por el BPPR, es vinculante y a su vez, fuente de obligaciones. Por tanto, el BPPR no podía llevar acciones en contra de sus propios actos, y de las representaciones que les hizo a las partes para que otorgaran contratos y se realizara el proyecto. Arguyeron que los demandados, en conjunto y común acuerdo, actuaron de mala fe y en contra de sus deberes contractuales y fiduciarios al ser negligentes en su deber de actuar de buena fe, y conforme a los contratos y representaciones, sus acciones y omisiones dejaron a WC insolvente.

Por lo anterior, solicitaron al TPI ordenar a los demandados a satisfacer lo siguiente: (1) el pago de pérdidas de proyectos de construcción por $10,000,000; (2) daños y perjuicios por $2,500,000; (3) pérdidas económicas por $1,500,000; (4) sufrimiento y angustias mentales de los accionistas por $3,000,000; y (5) costas, gastos y honorarios de abogado.

Luego de múltiples trámites judiciales, incluyendo revisiones ante esta *Curia* (KLAN201001884 y KLAN201900333), el 5 de agosto de 2020, el BPPR instó la contestación a la demanda en la que

aceptó algunas alegaciones y negó otras. Entre otros asuntos, admitió que concedió a Multiplazas una línea de crédito, no rotativa, por una suma de principal máxima de $26,000,000 para ser utilizada en la compra de un inmueble donde se construiría Plaza del Mar Mall por el monto de $14,000,000 y para financiar parcialmente los costos de construcción y desarrollo de dicho proyecto en una suma que no excedería los $12,000,000. Especificó que el desembolso estaba sujeto a los límites, términos y condiciones del *Credit Agreement* (Contrato de Préstamo) del 31 de agosto de 2005. También adujo que, al amparo del Contrato de Préstamo, el BPPR se comprometió a prestar dinero a Multiplazas siempre y cuando cumpliese con los términos y condiciones dispuestos en dicho contrato. Mencionó que, como parte del trámite para la obtención de la fianza de pago y ejecución para el Proyecto (*Payment y Performance Bond*), Multiplazas solicitó al BPPR que emitiera una carta a WC informando de la existencia de la referida línea de crédito. El 5 de mayo de 2017, el BPPR emitió la carta solicitada en la que informó que Multiplazas tenía una línea de crédito para la construcción del proyecto Plaza del Mar Shopping Center, y que el monto de la línea era de $26,750,000.

Arguyó que el BPRR no tiene relación contractual alguna con WC, nunca le efectuó pago alguno, ni tuvo participación alguna en el Contrato de Construcción otorgado entre WC y Multiplazas.

En lo aquí pertinente, el 11 de octubre de 2022, el BPPR presentó una *Solicitud para que se Dicte Sentencia Sumariamente* en la que formuló 42 determinaciones de hechos incontrovertidos los que permiten resolver el pleito de manera sumaria.[1]

---

[1] Véase, el Sistema Unificado de Manejo y Administración de Casos del TPI (SUMAC TPI), Entrada núm. 93, a las págs. 8-17. Acompañó el petitorio con los siguientes documentos: *Credit Agreement, First Amendment to Credit Agreement*, Carta emitida por el BPPR el 29 de marzo de 2007; Carta emitida por el BPPR el 19 de diciembre de 2007; "Standard Form of Agreement Between Owner and Contractor"; "Payment and Performance Bond" de 3 de mayo de 2007; Carta emitida por el BPPR el 5 de mayo de 2007; "Payment and Performance Bond" de

En el pedido, señaló que WC no formó parte del "Credit Agreement" y no existe estipulación o referencia a favor de esta que le atribuya directa o indirectamente un derecho a exigirle al banco el cumplimiento de obligación alguna, al amparo del referido contrato o a reclamar el desembolso de sumas alegadamente retenidas a Multiplazas por el BPPR. Así, solicitó que se desestimara la demanda con perjuicio en su contra, más se encontrase a WC incurso en temeridad y se le condenara al pago de las costas, gastos y honorarios de abogado.

El 14 de noviembre de 2022, WC incoó una *Réplica a Moción Solicitando que se Dicte Sentencia Sumaria y Moción Solicitando que se Dicte Sentencia Sumaria Parcial a favor de la Parte Demandante.* En esta, formuló 29 hechos que, a su entender, no están en controversia los cuales eran suficientes para dictar sentencia sumaria a su favor.[2] Además, aceptó como correctos los hechos números 1-6, 8-19, 21-23, 25-26, 29, y 31-42 esbozados por el BPPR en su petitorio desestimatorio.[3]

---

24 de septiembre de 2007 ("Dual Obligee Rider"); Informes de Inspección de Proyecto del Ing. William Ramos Dávila (Certificaciones núms. 2-9); Demanda en el caso Civil Núm. K CD2008-4032; *Sentencia Parcial en Rebeldía* en el Caso Civil Núm. K CD2008-4032; Escritura Núm. 23 sobre Venta Judicial otorgada el 25 de mayo de 2012; Contestación Enmendada a la Demanda y Demanda de Copartes en el Caso Núm. KCD2012-1399; Sentencia caso KCD2008-4032 (Desistimiento sin perjuicio); Sentencia (En cuanto al Codemandado Banco Popular de Puerto Rico) en el Caso Núm. KCD2012- 1399; "Agreement of Purchase and Sale of Real Property" (Plaza del Mar Hatillo); "Adversary Proceeding Cover Sheet/Bankruptcy Case and Complaint"; "Opinion and Order Case No. 15-06311 BKT"; Proyecto Centro Comercial Plaza del Mar- Detalle de Desembolsos emitido por el BPPR el 2 de noviembre de 2020; "Judgment Case No. 15-06311 BTK de 28 de agosto de 2017; Carta emitida por el BPPR el 2 de noviembre de 2020; Deposición Sra. Lymari Benique Morales, Deposición Sr. Hugo Ortiz Nieves; Deposición Sr. César Negrette Muñiz; "Loan and Facility (2999-2001); "Plaza del Mar Interim Line (3999-3001-3003-3005) and Plaza del Mar Additional Facility (4999-4001)"; Certificación de Desembolsos línea de Crédito de Multiplaza; "Plaza del Mar Interim Line"; y Copia de los cheques de Multiplazas a WC.

[2] *Íd.*, Entrada núm. 97, a las págs. 5-9.

[3] Incluyó como anejos los siguientes documentos: Sentencia del Tribunal de Apelaciones, Caso KLAN201001884 del 28 de abril de 2011; Deposición Sr. César Negrette Muñiz; Deposición Sr. Hugo Ortiz Nieves; Declaración Jurada Sra. Lymari Benique Morales del 14 de noviembre de 2022; Deposición Sra. Limarie Benique Morales; Proyecto Centro Comercial Plaza del Mar- Detalle de Desembolsos emitido por el BPPR el 2 de noviembre de 2020; Demanda Caso Núm. K CD2011-1399; Carta "Default" emitida por el BPPR el 15 de abril de 2008; y Carta intitulada "Notice of Default and Acceleration" emitida por el BPPR el 24 de octubre de 2008. Además, hizo referencia a algunos de los anejos que la parte apelada incluyó en la solicitud de sentencia sumaria.

WC arguyó que, en el descubrimiento de prueba, es que se revela que existe evidencia de falta de fondos para financiar los proyectos. Así fue que se demostró la falta de fondos para financiar los proyectos, ya que no quedaban $26,750,000, ni $12,000,000 en la partida de construcción, si no $3,442,392.99 al momento de la declaración y la representación del BPPR mediante la carta del 5 de mayo de 2007. Por lo que, la cuantía real restante era insuficiente y de haber conocido ello, WC no se hubiese obligado a realizar la construcción, ni solicitado una fianza.

El 3 de enero de 2023, el BPPR presentó la oposición a la antedicha moción instada por WC. En este escrito, especificó, entre otros argumentos, que se encuentra en controversia si la carta del 5 de mayo de 2007 constituye una declaración unilateral de voluntad vinculante y capaz de conferirle a WC el derecho a exigir cumplimiento o reclamar resarcimiento. En este aspecto, la parte apelada explicó que:[4]

> ... [e]s forzoso concluir que la Carta del 5 de mayo de 2007 no podía haber influido en la determinación de WC de adentrarse en una relación contractual con Multiplaza[s], la cual se perfeccionó desde el 13 de abril de 2007. Tampoco es cierto que esta misiva carecía de información importante para que WC determinara si contrataba con Multiplaza[s], ni que WC continuó construyendo bajo la creencia de que había disponibles más de 20 millones de dólares, como ahora alega la señora Benique en la declaración jurada anejada a la Réplica y Moción de Sentencia Sumaria Parcial de WC. La realidad es que, conforme declaró bajo juramento la señora Benique, la Carta del 5 de mayo de 2007 se expidió con el único propósito de: (i) informarle a la compañía fiadora de WC que existía un financiamiento para el Proyecto y (ii) de que esa fiadora expidiera un "Dual Obligee Rider" a favor del BPPR, en calidad de afianzado adicional.
>
> ...
> Es igualmente innegable que en la Carta del 5 de mayo de 2007 BPPR: (i) nunca se comprometió a asumir las obligaciones de Multiplaza[s] al amparo del Contrato de Construcción ni a pagarle a WC las sumas reclamadas en la Demanda de epígrafe, y (ii) no asumió obligación alguna de pago frente WC por las sumas reclamadas al amparo del Contrato de Construcción con Multiplaza[s]. Por consiguiente, esta misiva no constituye una declaración o manifestación unilateral de voluntad que vincule a Banco Popular ...

---

[4] SUMAC TPI, Entrada núm. 106, a las págs. 33-35.

...

...Contrario a lo argüido por el Demandante, en esta Carta no se encuentran presentes ninguno de los elementos requeridos para probar una causa de acción al amparo de la doctrina de declaración unilateral de voluntad. Simple y llanamente, la información contenida en dicha misiva era insuficiente para dejar establecida una obligación unilateral vinculante y capaz de conferirle derecho alguno a WC de exigir cumplimiento o resarcirse. De hecho, aun leyendo la Carta del 5 de mayo de 2007 de la forma más favorable al Demandante, es evidente que BPPR se limitó a informar a WC que Multiplaza[s] había obtenido una línea de crédito para la construcción del Proyecto. De esta Carta no surge manifestación alguna en virtud de la cual BPPR asumiera obligación o compromiso alguno de pagarle a WC las certificaciones si Multiplaza[s] incumplía con los pagos requeridos. Tampoco revela intención o voluntad alguna de BPPR de asumir una obligación hacia WC o a sus suplidores.

...

La contención del Demandante en cuanto a la Carta del 5 de mayo de 2007 es a todas luces incompatible con el escenario fáctico del caso, toda vez que ésta se emitió con posterioridad al otorgamiento del "Standard Form of Agreement". En consecuencia, la Carta del 5 de mayo de 2007 no podía engendrar una situación contraria a la realidad ni mucho menos influir en la conducta de WC para fines de su determinación de adentrarse en una relación contractual con Multiplaza[s]. Evidentemente, tampoco podía causar un estado de derechos sobre el cual WC pudiera apoyarse para instar reclamación alguna contra BPPR.

Analizados los mencionados escritos, el 13 de mayo de 2025, el foro primario emitió la *Sentencia* apelada en la que esbozó quince (15) determinaciones de hechos incontrovertidos los que le permitían resolver el caso por la vía sumaria.[5] A base de estos, el tribunal de instancia declaró *HA LUGAR* a la moción de sentencia sumaria instada por la parte apelada. Además, denegó la oposición al pedido del BPPR; así como a la petición de que se dictara sentencia sumaria a favor de WC. Por lo que desestimó en su totalidad y con perjuicio la demanda instada por la parte apelante.

A su vez, el foro a quo razonó que:[6]

En resumen, el argumento de Banco Popular recae en que, al no tener un vínculo contractual con William Contractor, cualquier reclamación al respecto es improcedente y jurídicamente no exigible. En otras

---

[5] *Íd.*, Entrada Núm. 119, a las págs. 5-10.
[6] *Íd.*, a las págs. 16-18. Notas al calce omitidas. Énfasis nuestro.

palabras, el banco entiende que William Contractor carece de legitimación, toda vez que el acuerdo de construcción en cuestión fue suscrito entre la contratista y Multiplaza[s] en función de dueña de la obra Plaza del Mar. Por su parte, en la oposición, William Contractor desistió de todas las reclamaciones en contra de Banco Popular, con excepción a los asuntos litigiosos relacionados a la doctrina de declaración unilateral de voluntad y actos propios. Conforme a ello, insistió que la carta emitida el 5 de mayo de 2007 por Banco Popular, lo indujo a error al establecer la existencia de una línea de crédito de $26,750,000.00 a favor de Multiplaza[s], cuando presuntamente quedaba menos dinero disponible, resultando en el impago de obras realizadas y ocasionándole pérdidas económicas sustanciales a William Contractor.

Según se estableció anteriormente, para que se configure la doctrina de actos propios, los siguientes elementos deben estar presente: (a) Una conducta determinada de un sujeto, (b) que haya engendrado una situación contraria a la realidad, esto es, aparente y, mediante tal apariencia, susceptible de influir en la conducta de los demás, y (c) que sea base de la confianza de otra parte que haya procedido de buena fe y que, por ello, haya obrado de una manera que le causaría un perjuicio si su confianza quedara defraudada.

Atando esto último a los hechos de autos, William Contractor sostuvo que Banco Popular faltó a la verdad al emitir la carta del 5 de mayo de 2007 y establecer una cantidad presuntamente equivocada, causando que la contratista confiara de buena fe en su contenido y haya sido defraudada, según dispone la doctrina de actos propios. Sin embargo, este foro entiende que no le asiste la razón. De la prueba que obra en el expediente y de las determinaciones de hecho, se desprende que el 31 de agosto de 2005, Multiplaza[s] y Banco Popular suscribieron el "Credit Agreement" para otorgarle a Multiplaza[s] $26,750,000.00 destinados a la construcción y desarrollo de Plaza del Mar. Acordaron que los adelantos de la línea de crédito se iban a efectuar directamente a Multiplaza[s] luego de recibir el correspondiente "Notice of Borrowing" en el que se justificara el uso de los fondos, se incluyera las órdenes de compra, entre otros detalles. Además, al suscribir el acuerdo, Multiplaza[s] se obligó a indemnizar al banco respecto a las pérdidas, daños y/o gastos relacionados a los adelantos. Es decir, la relación contractual que nació del "Credit Agreement" y las obligaciones correspondientes, vincularon a Multiplaza[s] y al banco exclusivamente. Ahora bien, ciertamente esa no es la única relación contractual aquí atendida.

El 13 de abril de 2007, William Contractor y Multiplaza[s] suscribieron el contrato de construcción cuyo monto pactado de $7,768,000.00 provino de la línea de crédito otorgada por Banco Popular. Sin embargo, la obligación de emitir los pagos y manejar la suma contractual era de Multiplaza[s] en función de dueña de la obra, no de la institución financiera que otorgó la línea de crédito.

Es importante aclarar que, para proyectos de construcción, el contratista general de una obra tiende a garantizar el cumplimiento de sus obligaciones mediante una fianza de construcción. Este tipo de

fianza se emitió por la fiadora USIC el 3 de mayo de 2007, y, como parte de las formalidades, condiciones y de los pasos que rige el procedimiento, Multiplaza[s] le solicitó directamente a Banco Popular que le comprobara a William Contractor la existencia de la línea de crédito de $26,750,000.00 otorgada para el proyecto. De modo que, el 5 de mayo de 2007, así lo hizo constar Banco Popular al indicarle a la contratista que "por este medio le confirmo que Multiplaza[s] [...] tiene en la actualidad una línea de crédito para la construcción del proyecto de epígrafe con esta institución. El monto de la línea es de $26,750,000.00". **De una simple lectura a la misiva es forzoso concluir que Banco Popular únicamente validó la existencia de una línea de crédito, pero no influyó a William Contractor a realizar conductas al respecto ni tenía voluntad de obligarse mediante dicha carta**. De hecho, en la referida carta, con excepción de que lo allí expresado no es contrario a la ley, la moral ni el orden público, tampoco están presentes los factores reconocidos en nuestro ordenamiento jurídico conforme a la declaración unilateral de voluntad, a saber: (1) la voluntad de la persona que pretende obligarse; (2) que el declarante tenga capacidad legal suficiente para obligarse; (3) que su intención de obligarse sea clara; (4) que la obligación tenga objeto; (5) que exista certeza sobre la forma y el contenido de la declaración; (6) que surja de un acto jurídico idóneo; y (7) que el contenido de la obligación no sea contrario a la ley, la moral ni el orden público.

**Dicho de otra forma, Banco Popular, como prestamista y entidad financiera, únicamente informó la cantidad de la línea de crédito que tenía Multiplaza[s]. Pero no se obligó a asumir los pagos que William Contractor debía recibir durante la ejecución del proyecto. Dicho deber le correspondía a Multiplaza[s] estrictamente**. En vista de ello, y luego de una estricta aplicación del derecho reseñado, este tribunal entiende que no proceden los reclamos de William Contractor en contra de Banco Popular.

Inconforme, el 21 de mayo de 2025, la parte apelante solicitó oportuna reconsideración, la cual fue declarada *NO HA LUGAR* mediante una *Resolución* emitida y notificada el 9 de julio de 2025.

Inconforme con el dictamen, la parte apelante acude ante este foro apelativo imputándole al foro primario haber incurrido en los siguientes errores:

ERRÓ EL TPT AL INTERPRETAR LOS HECHOS DEL CASO COMO SI LA CAUSA DE ACCIÓN FUESE DE UN CONTRATO TÍPICO DE CONSTRUCCIÓN, CUANDO LAS CAUSAS DE ACCIÓN VERSAN SOBRE DE ACCIONES Y OMISIONES PREVIAS AL PERFECCIONAMIENTO DE UN CONTRATO Y COMO CONSECUENCIA EL TPI INTERPRETÓ LA CERTIFICACIÓN OBJETO DE ESTE RECURSO DE FORMA LITERAL Y NO CONFORME A SU PROPÓSITO.

INCIDIÓ EN ERROR MANIFIESTO Y ABUSÓ DE SU DISCRECIÓN EL TPI, AL DICTAR SENTENCIA DESESTIMANDO LA CAUSA DE ACCIÓN CON PERJUICIO, SIN UTILIZAR EL MANDATO DE ESTE FORO EN EL CASO *WILLIAM CONTACTOR VS MULTIPLAZA Y BPPR* -KLAN201001884, EN LA INTERPRETACIÓN DE LOS HECHOS RELACIONADOS LA EXPEDICIÓN DE LA CERTIFICACIÓN DE FONDOS DE CONSTRUCCIÓN Y SUS CONSECUENCIAS A PESAR DE CONTAR CON LA PRUEBA YA DISPONIBLE Y PRESENTADA PARA RÉCORD.

El 18 de agosto de 2025, emitimos una *Resolución* concediendo a la parte apelada el término de treinta (30) días para expresarse. El 18 de septiembre siguiente se cumplió con lo ordenado, por lo que nos damos por cumplidos y a su vez, decretamos perfeccionado el recurso.

Analizados los escritos de las partes y el expediente apelativo; así como estudiado el derecho aplicable, procedemos a resolver.

## II.

### Mecanismo de Sentencia Sumaria

En nuestro ordenamiento jurídico, el mecanismo de la sentencia sumaria está gobernado por la Regla 36 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 36, la cual autoriza a los tribunales a dictar sentencia de forma sumaria si, mediante declaraciones juradas u otro tipo de prueba, se demuestra la inexistencia de una controversia sustancial de hechos esenciales y pertinentes. *Soto y otros v. Sky Caterers*, 2025 TSPR 3, 215 DPR ___ (2025); *Cruz, López v. Casa Bella y otros*, 213 DPR 980, 993 (2024) Específicamente, la Regla 36.1, 32 LPRA Ap. V, R. 36.1, atiende la solicitud de este tipo de disposición a favor de la parte reclamante en un pleito, mientras que la Regla 36.2, 32 LPRA Ap. V, R. 36.2, permite su petición a favor de la parte contra la que se reclama. En ambas reglas se establece lo siguiente:

**Regla 36.1. A favor de la parte reclamante**

Una parte que solicite un remedio podrá presentar, ..., una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una

controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación solicitada.

**Regla 36.2. A favor de la parte contra quien se reclama**

Una parte contra la cual se haya formulado una reclamación podrá presentar, ..., una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación.

Entretanto, la Regla 36.3, 32 LPRA Ap. V, R. 36.3, dispone los requisitos de contenido de la moción de sentencia sumaria y de la contestación a esta, entre otras particularidades del procedimiento. Estos requisitos, como los párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, no son un mero formalismo, ni constituye un simple requisito mecánico sin sentido. *SLG Zapata-Rivera v. J.F. Montalvo,* 189 DPR 414, 434 (2013).

En un primer plano, mediante el uso del mecanismo discrecional de la sentencia sumaria, se aligera la tramitación de un caso, puesto que, ante la ausencia de controversia de hechos, al tribunal solo le corresponde aplicar el derecho. *Oriental Bank v. Perapi et al.,* 192 DPR 7, 25 (2014). Así, sirve para propiciar la solución justa, rápida y económica de los litigios civiles que no presentan controversias genuinas de hechos materiales y que, por lo tanto, no requieren la celebración de un juicio en su fondo, ya que lo único que resta es dirimir una o varias controversias de derecho. *Íd.*

Este tipo de resolución procede en aquellos casos en los que no existen controversias **reales y sustanciales** en cuanto a los **hechos materiales y, por lo tanto, lo único que resta es aplicar el derecho**. *Consejo Tit. v. Rocca Dev. Corp.,* et als., 215 DPR ___, 2025 TSPR 6 (2025); *Meléndez González et al. v. M. Cuebas,* 193 DPR

100, 109 (2015). La precitada Regla 36 de las de Procedimiento Civil, *supra*, dispone, en esencia, que para permitir este tipo de adjudicación resulta necesario que, de las alegaciones, deposiciones, contestaciones a interrogatorios, admisiones, declaraciones juradas y cualquier otra evidencia surja que no existe controversia real y sustancial, respecto a ningún hecho esencial y pertinente; y en adición, que se deba dictar sentencia sumaria como cuestión de derecho. *Consejo Tit. v. Rocca Dev. Corp., et als.,* supra; *Meléndez González et al. v. M. Cuebas*, supra, a la pág. 109. En este sentido, solo procede dictarla cuando surge de manera clara que, ante los hechos materiales no controvertidos, el promovido no puede prevalecer ante el derecho aplicable y que el tribunal cuenta con la verdad de todos los hechos necesarios para resolver la controversia. *Meléndez González et al. v. M. Cuebas*, supra, a las págs. 109-110.

Es decir, por un lado, al promovente de la moción le toca establecer su derecho con claridad y demostrar que no existe controversia en cuanto a ningún hecho material, o sea ningún componente de la causa de acción. *Íd.*, a la pág. 110. Por el otro, al oponente le corresponde establecer que existe una controversia que sea real en cuanto a algún hecho material y, en ese sentido, no cualquier duda es suficiente para derrotar la solicitud de sentencia sumaria. *Íd.* Cabe recordar que, en este contexto, un hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. *Íd.* Mas específicamente, el oponente debe controvertir la prueba presentada y no debe cruzarse de brazos; pues de lo contrario, se expone a que se acoja la solicitud de sentencia sumaria y se le dicte en contra. *Ramos Pérez v. Univisión,* 178 DPR 200, 214-215 (2010). Esto significa que está obligado a contestar de forma detallada y específica aquellos hechos pertinentes que demuestran la existencia de una controversia real y sustancial que requiere dilucidarse en un juicio. *Íd.*, a la pág. 215.

En este ejercicio, debe presentar declaraciones juradas o documentos que pongan en controversia los hechos alegados por el promovente, recordando que tampoco puede descansar en meras alegaciones, sino que debe proveer evidencia sustancial de los hechos materiales en disputa. *Íd.*

No obstante, no oponerse a la solicitud de sentencia sumaria no implica ni que procederá dictarla obligatoriamente, si existe una controversia legítima sobre un hecho material, ni que corresponderá dictarla a favor de su proponente si no procede en derecho. *Íd.*

Ahora bien, se han establecido ciertas reglas limitantes de la discreción en el uso de la moción de sentencia sumaria. Por un lado, la determinación en cuanto a esta debe guiarse por un principio de liberalidad a favor de la parte que se opone, lo cual persigue evitar la privación del derecho de todo litigante a su día en corte cuando existen controversias de hechos legítimas y sustanciales que deben ser resueltas. *Íd.*, a las págs. 216-217. Por el otro, como norma general, los tribunales están impedidos de dictar sentencia sumaria en cuatro instancias: (1) cuando existan hechos materiales y esenciales controvertidos; (2) cuando hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) cuando de los propios documentos que acompañan la moción surge que existe una controversia sobre algún hecho material y esencial; o (4) cuando como cuestión de derecho no procede. *Oriental Bank v. Perapi*, supra, a las págs. 26-27. Dicho esto, cabe indicar que la moción de sentencia sumaria no está excluida en ningún tipo de pleito, puesto que, sin importar cuán complejo sea un pleito, puede dictarse si de una moción de sentencia sumaria bien fundamentada surge que no hay controversia sobre hechos materiales. *Meléndez González et al. v. M. Cuebas*, supra, a la pág. 112.

En lo relativo al ejercicio de la facultad revisora de este Tribunal de Apelaciones, sobre la procedencia de la sentencia

sumaria, **debemos utilizar los mismos criterios que el Tribunal de Primera Instancia**. *Meléndez González et al. v. M. Cuebas*, supra, a la pág. 115. En *Meléndez González,* el Tribunal Supremo consignó el siguiente estándar:

> "Primero, reafirmamos lo que establecimos en *Vera v. Dr. Bravo, supra*, a saber: el Tribunal de Apelaciones se encuentra en la misma posición del Tribunal de Primera Instancia al momento de revisar Solicitudes de Sentencia Sumaria. En ese sentido, está regido por la Regla 36 de Procedimiento Civil, *supra,* y aplicará los mismos criterios que esa regla y la jurisprudencia le exigen al foro primario. Obviamente, el foro apelativo intermedio estará limitado en cuanto a que no puede tomar en consideración evidencia que las partes no presentaron ante el Tribunal de Primera Instancia **y tampoco adjudicar los hechos materiales en controversia, ya que ello le compete al foro primario luego de celebrado un juicio en su fondo**. La revisión del Tribunal de Apelaciones es de *novo* y debe examinar el expediente de la manera más favorable hacia la parte que se opuso a la Moción de Sentencia Sumaria en el foro primario, llevando a cabo todas las inferencias permisibles a su favor.
>
> Segundo, por estar en la misma posición que el foro primario, el Tribunal de Apelaciones debe revisar que tanto la Moción de Sentencia Sumaria como su Oposición **cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civi**l, supra, y discutidos en *SLG Zapata-Rivera v. J.F. Montalvo*, supra.
>
> Tercero, **en el caso de revisión de una Sentencia dictada sumariamente**, el Tribunal de Apelaciones **debe revisar si en realidad existen hechos materiales en controversia**. De haberlos, el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil y debe exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos. Esta determinación se puede hacer en la Sentencia que disponga del caso y puede hacer referencia al listado numerado de hechos incontrovertidos que emitió el foro primario en su Sentencia.
>
> Cuarto y, por último, de encontrar que los hechos materiales realmente están incontrovertidos, el foro apelativo intermedio procederá entonces a revisar de *novo* si el Tribunal de Primera Instancia **aplicó correctamente el Derecho a la controversia**." (Énfasis nuestro). *Meléndez González et al. v. M. Cuebas*, supra, a las págs. 118-119.

Por último, esta norma ha sido reiterada año tras año por nuestro Tribunal Supremo, en donde ha establecido que los foros apelativos nos encontramos en la misma posición que los foros de primera instancia al evaluar la procedencia de una **sentencia**

**sumaria**. *Soto y otros v. Sky Caterers*, 2025 TSPR 3, 215 DPR ___ (2025); *Cruz, López v. Casa Bella y otros*, 213 DPR 980, 993 (2024); Birriel Colón v. Econo y otro, 2023 TSPR 120, 213 DPR 80, 91-92 (2023). Sin embargo, nuestra función se limita a: (1) considerar los documentos que se presentaron ante el foro de primera instancia; (2) determinar si existe alguna controversia genuina de hechos materiales y esenciales, y (3) comprobar si el derecho se aplicó de forma correcta. *Íd.* Cónsono a ello, también se ha establecido que los tribunales revisores estamos llamados a examinar el expediente *de novo* de la manera más favorable hacia la parte que se opone a la solicitud de sentencia sumaria en el foro primario y realizando todas las inferencias permisibles a su favor. *Soto y otros v. Sky Caterers*, supra; *Birriel Colón v. Econo y otro, supra, a las págs. 91-92.*

**Teoría General de los Contratos**

Los contratos existen desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio.[7] Artículo 1206 del Código Civil, 31 LPRA sec. 3371; *Amador v. Conc. Igl. Univ. de Jesucristo*, 150 DPR 571, 581 (2000). Existe un contrato cuando concurren los siguientes requisitos: (a) consentimiento de los contratantes; (b) objeto cierto que sea materia del contrato y (c) causa de la obligación que se establezca. Artículo 1213 del Código Civil, 31 LPRA sec. 3391; *Díaz Ayala et al. v. ELA*, 153 DPR 675 (2001); Véase, además, *Sonnell Transit Serv. v. Junta de Subastas*, 2025 TSPR 85, 216 DPR ___ (2025).[8] Por tanto, cualquiera que sea la forma en que se haya celebrado el contrato, **una vez concurren las condiciones**

---

[7] Destacamos que mediante la Ley núm. 55-2020 se aprobó el nuevo Código Civil de Puerto Rico. No obstante, el contrato en controversia fue otorgado previo a su vigencia. Por lo cual, aplicaremos el Código Civil de 1930 y la jurisprudencia interpretativa.

[8] En *Sonnell Transit Serv. v. Junta de Subastas*, 2025 TSPR 85, 216 PRR ___ (2025), el TSPR ratifica esta norma que rige el perfeccionamiento de los contratos.

**esenciales para su validez**, ellos son obligatorios. Artículo 1230 del Código Civil, *supra*, sec. 3451.[9]

Ahora bien, **el consentimiento se manifiesta por el concurso de la oferta y la aceptación sobre la cosa** y la causa que ha de constituir el contrato. Artículo 1214 del Código Civil, *supra*, sec. 3401;[10] *Pérez Rodríguez v. López Rodríguez*, 210 DPR 163, 205 (2022); *Prods. Tommy Muñiz v. COPAN*, 113 DPR 517, 521 (1982). Por otro lado, en cuanto al objeto, el Código Civil dispone que: "pueden ser objeto de contrato todas las cosas que no estén fuera del comercio de los hombres." Además, pueden ser objeto de los contratos aquellos servicios que no sean contrarios a la ley o las buenas costumbres. Artículo 1223 del Código Civil, *supra*, sec. 3421.

En cuanto a la *causa*, nuestro Código Civil establece que:

> "En los contratos onerosos se entiende por causa, para cada parte contratante, la prestación o promesa de una cosa o servicio por la otra parte; en los remuneratorios, el servicio o beneficio que se remunera, y en los de pura beneficencia, la mera liberalidad del bienhechor." Artículo 1226, *supra*, 31 LPRA sec. 3431.

Además, los contratos son fuente de obligación que se perfeccionan desde que las partes contratantes consienten voluntariamente a cumplir con los términos de los mismos. **Las partes contratantes no solamente se obligan a lo pactado, sino también a toda consecuencia** que sea conforme a la buena fe, al uso y a la ley. Artículo 1210 del Código Civil, *supra*, 31 LPRA sec. 3375;[11] *Unisys v. Ramallo Brothers*, 128 DPR 842, 850-851 (1991). Así pues, **cuando los términos del contrato son claros y no dejan dudas respecto a la intención de las partes, se debe atender al contenido literal de lo allí dispuesto**. Artículo 1233 del Código Civil de Puerto Rico, 31 LPRA sec. 3471.[12]

---

[9] Véase, Artículo 277 del Código Civil de 2020, 31 LPRA sec. 6161.
[10] Véase, Artículo 1238 del Código Civil de 2020, 31 LPRA sec. 9772.
[11] Véase, Artículo 1062 del Código Civil de 2020, 31 LPRA sec. 8983.
[12] Véase, Artículo 354 del Código Civil de 2020, 31 LPRA sec. 6342.

**La declaración unilateral de voluntad**

Por otro lado, en nuestro ordenamiento jurídico, la declaración unilateral de voluntad es reconocida como fuente de obligaciones. *Ortiz v. P.R. Telephone*, 162 DPR 715 (2004). Siempre que no sea contrario a la ley, a la moral, ni al orden público, nada impide que una persona, con capacidad plena para obrar y en ánimo de obligarse por su propio convencimiento y resolución firme, pueda quedar en derecho vinculada, solo mediante su indubitada declaración de voluntad unilateral, a dar, hacer o no hacer alguna cosa posible en favor de otra persona. *Ramírez Ortiz v. Gautier Benítez*, 87 DPR 497, 521 (1963). Para que una declaración unilateral sea vinculante deben concurrir los siguientes elementos: la sola voluntad de la persona que pretende obligarse; que dicha persona goce de capacidad legal suficiente; que su intención de obligarse sea clara; **que la obligación tenga objeto**; **que exista certeza sobre la forma y el contenido de la declaración**; que surja de un acto jurídico idóneo; y que el contenido de la obligación no sea contrario a la ley, la moral ni el orden público. *Ortiz v. P.R. Telephone*, supra. Si concurren esos requisitos, la declaración unilateral de voluntad vinculará al promitente desde el momento en que la efectúa, pudiendo estar sujeto a indemnizar los daños y perjuicios que provoque a raíz de su incumplimiento conforme al Artículo 1054 del Código Civil, 31 LPRA sec. 3018. Cuando una persona emite una declaración unilateral de voluntad, ello genera un estado de derecho sobre el cual descansan terceras personas y es necesario proteger la confianza generada, ya que a nadie le es lícito ir ni obrar contra sus propios actos. *International General Electric v. Concrete Builders*, 104 DPR 871, 876 (1976).

**Doctrina de los actos propios**

Nuestro ordenamiento también reconoce la doctrina de actos propios, la cual se discute en *International General Electric v.*

*Concrete Builders,* supra. Esta doctrina establece que cuando una parte asumió una conducta mediante la cual creó un estado de derecho que ganó la confianza de una persona, quien descansa y actúa a base de esa conducta, la parte se ve impedida de asumir una posición contraria a la ya manifestada. Al referirse a la doctrina de los actos propios, el Tribunal Supremo expresó:

> En la construcción jurídica autónoma que da contorno a la norma de no ir contra los propios actos el efecto se produce de un modo objetivo, en el cual para nada cuenta la verdadera voluntad del autor de los actos. Se protege la confianza que estos actos suscitan en los terceros, porque venir contra ellos constituiría obviamente un ataque a la buena fe. Cuando se impide que una persona vaya contra sus propios actos, se deja por completo de lado toda la doctrina de declaración de voluntad para imponer directamente un efecto jurídico. *Íd.*, a las págs. 876-877.

Al respecto, el más alto foro decretó los elementos constitutivos para que aplique la norma jurídica de no ir contra los actos propios. Éstos son que exista: (a) una conducta determinada de un sujeto, (b) que haya engendrado una situación contraria a la realidad, esto es, aparente y, mediante tal apariencia, susceptible de influir en la conducta de los demás, y (c) que sea base de la confianza de otra parte que haya procedido de buena fe y que, por ello, haya obrado de una manera que le causaría un perjuicio si su confianza quedara defraudada. Carmona, Negrón v. BSN y otros, 214 DPR 388, 399 (2024); *International General Electric v. Concrete Builders*, supra, a la pág. 878.

### III.

En esencia, la parte apelante expuso que erró el TPI al resolver el caso de manera sumaria, interpretando erróneamente que los hechos del mismo dictan sobre un contrato de construcción cuando la causa de acción versa sobre acciones y omisiones previas al perfeccionamiento de un contrato. Asimismo, arguyó que el foro primario incidió en error manifiesto y abusó de su discreción al dictar sentencia desestimando la causa de acción con perjuicio, sin utilizar el mandato de este foro apelativo en el caso *William*

*Contractor vs Multiplaza y BPPR* (KLAN201001884), en la interpretación de los hechos relacionados a la expedición de la certificación de fondos de construcción y sus consecuencias.

De entrada, resolvemos que las mociones presentadas por las partes cumplen con las formalidades procesales dispuestas en la Regla 36 de las de Procedimiento Civil, *supra*. A continuación, nos corresponde determinar, si en efecto, existe alguna controversia sustancial de hechos esenciales que ameriten la celebración de un juicio plenario, y si el derecho se aplicó correctamente.

Respecto al primer error, WC argumentó en su recurso, que "La reclamación de WC contra BPPR está basada en acciones y omisiones ocurridas previo al comienzo de la ejecución del contrato. La reclamación contractual era contra Multiplaza[s] y está resuelta en un pleito anterior." Añadió que "Se reclama por las consecuencias de la emisión de una carta de certificación de fondos para la construcción solicitada por el apelante como requisito previo a la ejecución del contrato."[13]

Añade la parte apelante que, según la certificación de detalle de desembolsos de préstamo, provista por el BPPR a través de uno de sus oficiales, Sr. César Negrette Muñiz, quien también así lo testificó en la deposición, que:

> Con el detalle de desembolsos provisto por BPPR se demuestra que al momento de la certificación de fondos para construcción no había fondos suficientes para cubrir el monto del contrato y que el dueño de la obra ya estaba en "*default*".[14]

Por otro lado, la parte apelada, en su escrito intitulado *Alegato en Oposición del Banco Popular de Puerto Rico* arguyó que, de lo establecido en los contratos, no surge obligación de BPPR a garantizar o asegurar financiamiento de terceros, sino que "circunscribe cualquier desembolso a condiciones y aprobaciones

---

[13] Véase, el *Recurso de Apelación*, en el Sistema Unificado de Manejo y Administración de Casos del TA (SUMAC TA), Entrada núm. 4 a la pág. 15.
[14] *Íd.*, a las págs. 15-16.

expresas" con relación a la Multiplazas. Añadió que, lo que establecía la carta del 5 de mayo de 2007 era una línea de crédito sujeta a términos y condiciones, no a una cantidad líquida para su ejecución inmediata. Por último, argumentó que el tracto cronológico en este caso evidenciaba que la carta no influenció en la contratación entre WC y la fiadora, toda vez que el contrato se suscribió antes.[15]

Sobre los argumentos esbozados por WC y según lo planteado por el BPPR, tenemos que advertir que por el detalle de las fechas según transcurrieron los hechos pertinentes a la controversia planteada, no encontramos que el BPPR haya movido a WC a actuar en base al contenido de la misiva del 5 de mayo de 2007. Nos explicamos.

Resultan ser hechos incontrovertidos, según esbozados por el TPI en la *Sentencia* apelada, que: (1) el 31 de agosto de 2005, Multiplazas y el BPPR suscribieron el *Credit Agreement*,[16] para otorgarle a Multiplazas $26,750,000 destinados a la construcción y desarrollo del Centro Comercial Plaza del Mar; (2) los Contratos de Construcción fueron suscritos por WC y Multiplazas el **13 de abril de 2007**[17]; (3) WC gestionó la fianza requerida para el proyecto desde el 3 de mayo de 2007; y (4) la carta referente a la línea de crédito fue emitida por el BPPR el **5 de mayo de 2007**.

Por lo que, solo acorde con estas fechas, nos es inverosímil entender el argumento argüido por la parte apelante de que no hubiese firmado el contrato, si a dicha fecha, hubiese conocido la cuantía de los fondos que quedaban para la obra. Recordemos que,

---

[15] Véase, *Alegato en Oposición del Banco Popular de Puerto Rico*, en SUMAC TA, Entrada núm. 7 a las págs. 17-27.

[16] Mediante la enmienda intitulada "*First Amendment to Credit Agreement*" se añadió una cuantía adicional.

[17] Advertimos que según los documentos analizados se suscribieron dos (2) contratos el 13 de abril de 2007. Véase, además, la nota al calce 1 de la *Solicitud para que se Dicte Sentencia Sumariamente,* SUMAC TPI, Entrada núm. 93, a la pág. 1.

el 13 de abril de 2007, se suscribió el Contrato de Construcción previo a la carta emitida por el BPPR el **5 de mayo de 2007**.

En este punto, reseñamos que la Sra. Lymari Benique Morales (señora Benique Morales), quien fungía como Administradora y Secretaria de WC, especificó que cuando se firmaron los Contratos de Construcción entre la parte apelante y Multiplazas, se confió en las representaciones que le hiciera el Sr. José Mercado, dueño de Multiplazas.[18] Indicó, además, que nunca ha visto el Contrato de Préstamo firmado entre el BPPR y Multiplazas.[19] Esta mencionó que la carta del 5 de mayo 2007 era una exigencia de la Compañía de Seguros para emitir la fianza.[20] Expresó que, previo a la expedición de esta misiva, no tuvo comunicación alguna con oficiales del BPPR para que se emitiera la misma.[21]

La señora Benique Morales reafirmó que los dos Contratos de Construcción y la fianza "Perfomance and Payment Bond" por $5,000,000 **fueron firmados y emitidos, respectivamente, con anterioridad a que el BPPR certificara que existía un contrato de financiamiento o préstamo para el proyecto Plaza del Mar**.[22] Esta aseveró que la carta del 5 de mayo de 2007, no decía que la totalidad de los $26,750,000 era para pagar el proyecto de WC sino que en esta cuantía estaba su contrato.[23] No obstante, expresó que tenía la creencia razonable que habían más de $20,000,000 para el

---

[18] Véase, la *Solicitud para que se Dicte Sentencia Sumariamente*, Anejo 22, a las págs. 79-80. Véase, también, la *Réplica a Moción Solicitando que se Dicte Sentencia Sumaria y Moción Solicitando que se Dicte Sentencia Sumaria Parcial a favor de la Parte Demandante*, Anejo 5, a las págs. 99-100.

[19] Véase, la *Solicitud para que se Dicte Sentencia Sumariamente*, Anejo 22, a las págs. 79-80.

[20] Véase, la *Réplica a Moción Solicitando que se Dicte Sentencia Sumaria y Moción Solicitando que se Dicte Sentencia Sumaria Parcial a favor de la Parte Demandante*, Anejo 5, a la pág. 99.

[21] *Íd.*, a la pág. 100.

[22] Véase, la *Réplica a Moción Solicitando que se Dicte Sentencia Sumaria y Moción Solicitando que se Dicte Sentencia Sumaria Parcial a favor de la Parte Demandante*, en SUMAC TPI, Anejo 5, a la pág. 105.

[23] *Íd.*, a la pág. 113.

proyecto de acuerdo a la facturación previa y al contenido del documento.[24]

Así pues, y como razonó el TPI, "De una simple lectura a la misiva es forzoso concluir que Banco Popular únicamente validó la existencia de una línea de crédito, pero no influyó a William Contractor a realizar conductas al respecto ni tenía voluntad de obligarse mediante dicha carta." Respecto a esto, WC no presentó evidencia de cuándo la Compañía de Seguros solicitó la carta y cuál fue la información específica que peticionó en el requerimiento. Por tanto, no encontramos forma de avalar el argumento expresado en el recurso de que "La carta se solicitó, para saber si había fondos para cubrir los contratos de construcción y la carta certifica que la línea de crédito era para la construcción."[25]

De otra parte, es otro hecho incontrovertido que en el Contrato de Préstamo se dispuso diáfanamente que **Multiplazas venía obligada a pagar todos los costos del proyecto que excedieran el límite de la línea de crédito**.[26] Además, el Sr. César Negrette Muñiz, Oficial de Relación en la División de Préstamos Especiales del BPPR[27], declaró que el banco aprobó el financiamiento de la obra pero que WC, como desarrollador, es quien al firmar el Contrato de Construcción con Multiplazas, **debe conocer la cantidad restante de la línea de crédito, ya que de haber alguna deficiencia, vendría obligado a aportarla, o sea, conseguir los fondos para cubrir la diferencia**.[28] **Agregó que, el banco no tiene la obligación**

---

[24] *Íd.*, a la pág. 178.

[25] Véase, el Recurso de Apelación, SUMAC TA a la pág. 16.

[26] Véase, la *Solicitud para que se Dicte Sentencia Sumariamente*, en SUMAC TPI Anejo 1, a la pág. 37.

[27] Este aclaró que no participó en la perfección y firma de este contrato, y empezó a trabajar en el mismo en el 2012.

[28] *Íd.*, Anejo 24, a las págs. 29-30, 178-179. Véase, también, la *Réplica a Moción Solicitando que se Dicte Sentencia Sumaria y Moción Solicitando que se Dicte Sentencia Sumaria Parcial a favor de la Parte Demandante*, Anejo 2, a las págs. 68-69.

de **"financiar ese beneficio."**[29] No obstante, este declaró que el concepto "In Balance" establecido en el Contrato de Préstamo significa que en cualquier momento dado los fondos que quedan por desembolsar en el préstamo deben ser iguales a lo que se estima hacen falta para completar el proyecto.[30] Al respecto aseveró que, al Sr. Héctor Viña, Oficial de Relación del BPPR, era a quien le correspondía la responsabilidad de verificar que el préstamo estuviese "In Balance".[31]

De igual manera, el señor Negrette Muñiz explicó que, para efectos de contabilidad, el BPPR dividió los fondos de la línea de crédito (préstamo) en tres notas (partidas) numeradas 3001, 3003 y 3005 identificadas como: Adquisición de Terreno, Construcción e Intereses, respectivamente.[32] Indicó que, al 30 de marzo del 2007, quedaban $11,391,461.80 para desembolsar del préstamo, cuantía que surge de la suma de todos los pagos posteriores a esa fecha.[33] También, aclaró que en la partida de construcción quedaban, al 30 de marzo de 2017, $3,263,963.50.[34]

Sin embargo, reiteramos que WC, como desarrollador del Proyecto Plaza del Mar, al suscribir el Contrato de Construcción con Multiplazas, tenía la obligación de conocer el monto que quedaba en la línea de crédito para realizar la obra. Esto, debido a que, de no contar con los fondos suficientes para el trabajo, era responsable de aportarlos o conseguirlos para cubrir cualquier diferencia que tuviese la línea de crédito, según se dispuso diáfanamente en el Contrato de Préstamo con el BPPR. Así pues, no podemos ignorar

---

[29] *Íd.*, a la pág. 30. Véase, también, la *Réplica a Moción Solicitando que se Dicte Sentencia Sumaria y Moción Solicitando que se Dicte Sentencia Sumaria Parcial a favor de la Parte Demandante*, Anejo 2, a la pág. 30.
[30] *Íd.*, Anejo 2, a la pág. 27.
[31] *Íd.*, Anejo 2, a las págs. 27-28.
[32] *Íd.*, Anejo 2, a la pág. 145. Véase, también, el Anejo 6.
[33] *Íd.*, Anejo 2, a las págs. 148 y 160-161. Véase, también, el Anejo 6. Recordemos que los Contratos de Construcción firmados entre WC y Multiplazas ascendían a $7,768,000. Advertimos que realizamos el cálculo y el resultado aritmético es igual.
[34] *Íd.*, Anejo 2, a las págs. 157-159 y 161. Véase, también, el Anejo 6.

que la señora Benique Morales mencionó que entre las partes habían realizados otros proyectos de construcción, lo que implica que cada cual conoce los elementos indispensables para finiquitar un contrato y obtener las garantías para recibir los pagos. Más aún, esta especificó que WC había realizado varios proyectos mediante subasta con Municipios y el Gobierno; así como proyectos privados como urbanizaciones y un edificio de apartamentos para los que, en algunos, el Banco Popular fue quien los financió. Es decir, no cabe duda de que WC es una compañía con vasta experiencia en el ambiente de la construcción y conocedora de los procesos para el financiamiento de los proyectos.

A base de lo antedicho, el primer error no fue incurrido por el TPI.

Por su parte, en el segundo error WC arguye que el TPI debió haber tomado como hechos adjudicados y aplicar lo dictaminado por un Panel hermano de esta *Curia* en el caso *William Contractor, Inc. v. Multiplazas de Puerto Rico, Inc. y Banco Popular de Puerto Rico*, KLAN201001884, cuya Sentencia fue emitida el 28 de abril de 2011, en la evaluación de las mociones de sentencias sumarias del caso ante nuestra consideración.

Precisa indicar que, en el referido caso, el Panel hermano revocó la determinación del foro primario, en la que mediante Sentencia Parcial desestimó la demanda instada contra el BBPR al amparo de la Regla 10.2 (5) de las de Procedimiento Civil. Allí, el foro revisado entendió que, conforme a las alegaciones de la demanda y los documentos presentados por el banco, no existía la concesión de un remedio a favor de William Contractor contra el Banco Popular.

Evaluado el recurso, esta *Curia* dictaminó y citamos:

> Ante una moción de desestimación presentada conforme a la Regla 10.2 inciso 5, supra, el tribunal tomará como ciertos todos los hechos bien alegados en la demanda. Al examinar la solicitud de desestimación, el tribunal interpretará las alegaciones de la demanda

de una manera conjunta y liberal, y de la forma más favorable posible a la parte demandante. Esto es, conceder el beneficio de cuanta inferencia sea posible hacer de los hechos bien alegados en la demanda.

De las alegaciones realizadas en la demanda, consideradas como ciertas, existe posibilidad de obligación por parte del Banco Popular con los demandantes. A pesar de que el Banco Popular en la solicitud de desestimación bajo la Regla 10.2 inciso 5 de Procedimiento Civil, supra, argumenta que las alegaciones de la demanda de William Contractor se basan en una carta de 5 de mayo de 2007 y que según surge de la carta, el Banco Popular no se compromete de forma alguna con la deuda. Las alegaciones de la demanda apuntan a que previo a la carta de 5 de mayo de 2007 el Banco Popular había realizado representaciones a William Contractos [*sic*] en las cuales le informó que para el proyecto en cuestión había una línea de crédito concedida a Multiplazas. De ser ciertas tales representaciones, y las alegaciones en cuanto a que por tales representaciones William Contractor realizó el contrato con Multiplazas, el Banco Popular puede ser responsable bajo la doctrina de actos propios.

Además, el Banco Popular alegó en la Moción de Desestimación que no existe ninguna relación contractual entre ellos y William Contractor, y que el contrato entre Multiplazas y ellos no tenía disposición a favor de William Contractor. Ello contrario a lo alegado por William Contractor en la demanda. No obstante, para demostrar tal hecho el Banco Popular presentó únicamente las partes del contrato que entendieron pertinentes y no totalidad del mismo. Con la presentación parcial del contrato el Banco Popular no demostró el hecho alegado; esto es, que en el contrato no existía disposición a favor de William Contractor.

Con la presentación de la carta del 5 de mayo de 2007 y el contrato incompleto entre el Banco Popular y Multiplazas al que alude la demanda, el Banco Popular no demostró que las alegaciones de la demanda no expusieran una reclamación que justificara la concesión de un remedio. Las alegaciones que hacen referencia a representaciones previas a la carta por parte del Banco Popular que le hicieron creer al William Contractor que existían fondos para la construcción de la obra y las alegaciones en cuanto a que el contrato entre el Banco Popular y Multiplazas tenía una estipulación a favor de ellos como terceros, de ser probadas, pueden establecer responsabilidad por parte del Banco Popular a favor de William Contractor. Por lo que erró el Tribunal de Primera Instancia al desestimar bajo la Regla 10.2 de Procedimiento Civil, supra, la acción instada contra el Banco Popular.

Recordemos que, para que proceda una moción de desestimación bajo la Regla 10.2 de las de Procedimiento Civil, 32 LPRA Ap. V, R. 10.2, "tiene que demostrarse de forma certera en ella que el demandante no tiene derecho a remedio alguno bajo cualquier estado de derecho que se pudiese probar en apoyo a su reclamación,

aun interpretando la demanda lo más liberalmente a su favor." *BPPR v. Cable Media,* 2025 TSPR 1, 215 DPR ___ (2025); *Rivera San Feliz et al. v. Jta. Dir. First Bank,* 193 DPR 38, 49 (2015); *Ortiz Matías et al. v. Mora Development,* 187 DPR 649, 654 (2013).

Asimismo, ante una moción de desestimación, bajo la antedicha norma, la demanda y sus alegaciones han de ser consideradas por el tribunal lo más liberalmente posible a favor de la parte demandante. El tribunal que evalúa la moción de desestimación debe concederle a la parte demandante el beneficio de toda inferencia posible que pueda surgir de la demanda.

Por su parte, nos explica el tratadista Cuevas Segarra que:

> Esta regla permite al demandado solicitar que se desestime la demanda en su contra, cuando entre otras razones ésta "no expone una reclamación que justifique la concesión de un remedio". A los fines de disponer de una moción de desestimación, el Tribunal está obligado a dar por ciertas y buenas todas las alegaciones fácticas de la demanda presentada. **El promovente tiene que demostrar que presumiendo que lo allí expuesto es cierto, la demanda no expone una reclamación que justifique la concesión de un remedio**. Esta doctrina se aplica solamente a hechos bien alegados y expresados de manera clara y concluyente, que de su faz no den margen a dudas. La demanda no deberá ser desestimada a menos que se desprenda con toda certeza que el demandante no tiene derecho a remedio alguno bajo cualquier estado de hechos que puedan ser probados en apoyo de su reclamación No se determinará si el demandante prevalecerá finalmente en el pleito, sino si el demandante tiene o no derecho a ofrecer prueba que justifique su reclamación, asumiendo como ciertos los hechos bien alegados en la demanda.
> …
> La controversia no es si el demandante va a finalmente prevalecer, sino, si tiene derecho a ofrecer prueba que justifique su reclamación, asumiendo como ciertos los hechos bien alegados en la demanda.
> José Cuevas Segarra, *Tratado de Derecho Procesal Civil,* Publicaciones JTS, 2000, Tomo I, pág. 271 citando a *Davis y Monroe County Board of Ed.,* 143 LE 2d 839 (1999). (Énfasis nuestro)

Por ello, al evaluar una moción al amparo de la Regla 10.2 de las de Procedimiento Civil, *supra,* cuando el promovente alega falta de parte indispensable, falta de jurisdicción o dejar de exponer una reclamación que justifique un remedio, ni el tribunal ni la parte demandada ponen en duda, para efectos de esa moción, los hechos

alegados en la demanda porque se ataca por un vicio intrínseco de esta o del proceso seguido. *Roldán v. Lutrón, S.M., Inc.*, 151 DPR 883 (2000).

Por tanto, el referido estándar de revisión fue aplicado a las alegaciones incluidas en la demanda de dicho pleito a los únicos fines de evaluar la moción de desestimación allí presentada. Es decir, en el dictamen emitido tanto por el TPI, en el caso KCD2008-4032, como en la Sentencia del recurso KLAN201001884, solo se analizaron las alegaciones de la demanda para determinar si las mismas rebasaban la moción de desestimación, al palio de la 10.2 de las de Procedimiento Civil, *supra*. Por ende, el Panel hermano en su Sentencia, no decretó remedio alguno a favor de WC, sino que permitió que el caso continuara en el foro recurrido. Esto, acorde con la normativa respecto la consideración de un pedido de esta naturaleza.

Corolario de lo anterior, es improcedente en derecho pretender afirmar que, en la Sentencia, este tribunal revisor haya reconocido y más aún, validado las alegaciones de la declaración unilateral de voluntad bajo un acto propio del BPPR. Como bien, expresó este foro intermedio, **solo de ser probadas dichas alegaciones**, se puede establecer responsabilidad por parte del BPPR a favor de WC. En este sentido, le corresponde demostrar ahora a WC, tanto en la oposición a sentencia sumaria como en su petición de igual índole, con evidencia fehaciente, lo alegado en la demanda sobre este asunto.

Como bien apuntaló el BPPR en la *Oposición a "Moción de Reconsideración"* instada ante el TPI "... la referida Sentencia del Tribunal de Apelaciones de forma alguna obliga a este Honorable Tribunal en la disposición sumaria del caso. No solo esa Sentencia se basó en un examen de alegaciones fácticas distintas, sino que de ninguna manera el TA evaluó en qué medida esas alegaciones de

hechos podían sostenerse con la prueba. Por el contrario, tras concluir que las alegaciones de la Demanda de 2008 eran suficientes a los únicos fines de superar una moción de desestimación bajo la Regla 10.2(5) de Procedimiento Civil, el propio TA puntualizó de forma expresa que solo de ser ciertas las alegaciones en esa Demanda de 2008, el BPPR podría ser responsable bajo la doctrina de actos propios".[35]

En fin, el segundo error carece de méritos y, en consecuencia, no fue incurrido por el foro *a quo*.

**IV.**

Por los fundamentos antes expuestos, determinamos *confirmar* la *Sentencia* apelada.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones

---

[35] Véase, el Sistema Unificado de Manejo y Administración de Casos del TPI, Entrada núm. 127, a la pág. 14.